SAGINAW UNION STREET RAILWAY v. THE MICHIGAN CENTRAL RAILROAD COMPANY.

*Railroad crossings—Electric railways—Trespass—Damages.*

1. The Commissioner of Railroads has no arbitrary power to fix 24 feet as the height at which the trolley wires of an electric street railway shall be strung and maintained above the track of a railroad company, in the absence of any showing that a less height is insufficient to prevent any danger to the employés of the railroad.

2. The refusal of a railroad company to permit the trolley wires of an electric street railway which cross its track to be raised to a height sanctioned by the Commissioner of Railroads in

91 MICH—42.

other cities, and six inches higher than any bridge upon the railroad company's line, which could have been done without cutting the wires or destroying property, and its cutting of the wires at a time when the street railway company was operating its entire road, is an inexcusable violation of the rights of the latter company, and justifies the recovery of all damages sustained by said company on account thereof.

Error to Saginaw. (Gage, J.) Argued April 14, 1892. Decided May 20, 1892.

Trespass. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Hanchett, Stark & Hanchett* (*Ashley Pond,* of counsel), for appellant, contended:

1. It is conceded by the charge that, if the wires were an obstruction to the defendant's road, their maintenance was unlawful. In such case all that could be required of the defendant in the exercise of its right of removal was that, in the acts of making such removal, it should do no unnecessary damage to the plaintiff. The law does not require that no damage at all must be done; citing *Wetmore v. Tracy,* 14 Wend. 250, 256; *Meeker v. Van Rensselaer,* 15 Id. 397; *Winchell v. Clark,* 68 Mich. 75; *State v. Parrott,* 71 N. C. 311; *Arundel v. McCulloch,* 10 Mass. 70; *Brown v. Perkins,* 12 Gray, 89, 101; Cooley, Torts, 46-49; *Moffett v. Brewer,* 1 Greene (Iowa), 348, 350; *Renwick v. Morris,* 7 Hill, 575, 577; *Jones v. Williams,* 11 Mees. & W. 176, 181; *Davies v. Williams,* 16 Q. B. 546, 556.

2. The charge as given cannot be upheld on the ground that the wires might have been removed without damage to the property of the plaintiff, because the evidence does not show that there was any time when the removal could be made and "do no damage to the property of the plaintiff."

3. In case unnecessary damage was done, the liability of the defendant would be for the excess of damage; citing *Great Falls Co. v. Worster,* 15 N. H. 412, 439; Wood, Nuis. (2d ed.) § 740, pp. 818, 819; Cooley, Torts, 48, 49; *Greenslade v. Halliday,* 6 Bing. 379; *Indianapolis v. Miller,* 27 Ind. 394, 398, 399; *Northrop v. Burrows,* 10 Abb. Pr. 365.

4. It is not claimed that there is any provision of the statute which confers upon the Commissioner of Railroads authority over

street railroads. What is claimed is that the general power of the Commissioner relating to commercial roads authorized his action as against them; that he may require of commercial roads that they shall not permit dangers to their employés of this character to exist when the obstructions which constitute the dangers are unlawful, and may be removed by the railroad companies; citing Railroad Laws, Mich. 1890, §§ 8, 10, 11, 14, 15, 17, 19, 27, 30.

5. The lessened value of dynamo No. 2 by reason of its injury by cutting the wires constitutes the measure of damages on that branch of the case; citing 3 Suth. Dam. 472, 473; *Davidson v. Railroad Co.*, 49 Mich. 428, 431; *Keyes v. Railway Co.*, 36 Minn. 290; *Reed v. Railroad Co.*, 48 Hun, 231.

*L. T. Durand* (*O. F. Wisner*, of counsel), for plaintiff, contended:

1. As the places of intersection were public streets, in which both parties had corresponding rights, neither was privileged to interfere with the reasonable enjoyment by the other of its rights, and the defendant had not the absolute right to insist that it might load its cars to any height it pleased, and thereby prevent the enjoyment by the plaintiff of its franchise in the public streets; citing 1 How. Stat. §§ 2559, 3323 (subd. 5); 3 How. Stat. §§ 3323, 3334a; 2 Dill. Mun. Corp. § 708 (note); 1 Rorer, Railroads, 553; Pierce, Railroads, 159, 193, 245-248; *Kelly v. Railroad Co.*, 65 Mich. 190, 191; and the right of the city to grant franchises to street railroads in the public streets, and to regulate the system, is recognized by the courts; citing *Detroit City Railway v. Mills*, 85 Mich. 635; *Taggart v. Railway Co.*, 19 Atl. Rep. 326; *Lockhart v. Railway Co.*, 139 Penn. St. 419; and the defendant, through its officers, knew of the plaintiff's wires being placed across its tracks, and made no objection; citing *Blake v. Cornwell*, 65 Mich. 468.

2. Treating the alleged obstruction as a nuisance, and defendant's act as an abatement of it, the rule is stated in 16 Amer. & Eng. Enc. Law, 989; Cooley, Torts, 47-49; Wood, Nuis. (2d ed.) §§ 740, 845, pp. 819, 977; *Wetmore v. Tracy*, 14 Wend. 255; *Shepard v. People*, 40 Mich. 492, 493; *Clark v. Ice Co.*, 24 Id. 512; *Clark v. Dasso*, 34 Id. 86; *Laviosa v. Railroad Co.*, 4 Amer. & Eng. R. R. Cases, 128.

MORSE, C. J. The Michigan Central Railroad Company operates its road across Genesee and Washington streets, in the city of Saginaw, upon the track of the

Detroit & Bay City Railroad Company, which latter company has had the right of way across these streets by grant from the city of East Saginaw since the year 1878. The Saginaw Union Street Railway, then operating its road by horse-power, in December, 1889, changed its operating power to electricity, by permission of the ·city granted by ordinance. It saw fit to use the trolley system. It placed the trolley wires across the defendant's tracks on Genesee and Washington streets. At Genesee street the overhead wire was placed 19 feet $9\frac{1}{2}$ inches above the defendant's track rails; at Washington street, 19 feet 6 inches above such rails. On the 16th day of May, 1890, while the plaintiff was in the full operation of its road and running its street cars, the defendant company cut the wires of plaintiff where they crossed its tracks on Genesee and Washington streets. For this act the plaintiff brought this suit in trespass, and recovered a verdict and judgment for $933.03.

The defense to this action was, in substance, that in operating the defendant company's road it was necessary to pass under these wires cars from 12 to 14 feet and 3 inches in height from the tracks, and cars loaded with lumber to the height of 15 feet; that it was necessary to have brakemen standing upon the top of these cars to signal the engineer and for other purposes; and that, under these necessities, the wires of plaintiff were not placed at a sufficient height from the ground so that defendant's railway could be operated in the usual manner, with safety to its employés; that February 11, 1890, John T. Rich, then State Railroad Commissioner, issued an order to the general managers and superintendents of Michigan railroads, instructing them not to permit the erection or maintenance of the wires of electric street railways at a less distance above their tracks than is allowed for bridges and other obstructions not suitably

guarded, and that this distance should not be less than 24 feet above the track.    April 12, 1890, W. A. Vaughn, division superintendent of defendant, notified the plaintiff, by letter, that its wires were less than 24 feet above defendant's tracks, and of the Railroad Commissioner's order, and asked plaintiff company to comply with such order.    April 15, 1890, the president of plaintiff company replied to this letter that it was its intention to have its wires 22 feet 6 inches above the track at steam railway crossings, being advised that such height was sufficient, and was the standard for highway bridges.    This letter Mr. Ledyard, president of the defendant company, answered by letter of May 3, 1890, stating that such company would not permit the wires of plaintiff to be strung across its tracks at the height of 22 feet 6 inches, and further wrote:

"I am constrained to advise you that if by May 15, 1890, the wires of your company, where they may cross the right of way or tracks of this company, or any of its leased lines, are not placed at the height of 24 feet, this company will proceed to remove the same from its right of way."

Nothing further being done by the plaintiff company, the defendant cut the wires of plaintiff at these two street crossings about 4 o'clock P. M. May 16, 1890.

The circuit judge instructed the jury as follows, after stating the circumstances of the case, and the claims of the respective parties:

"Gentlemen of the jury: It appears from the testimony in this case that the wires of the plaintiff were cut at four o'clock in the afternoon, during a busy hour, when the plaintiff's road was in full operation, when all the dynamos were at work, when the cars were all running, in broad daylight, and while people were traveling to and fro.    It appears that the effect of the cutting was to stop all the cars throughout the city at the very point where they were at the time the cutting occurred.    There was

no further current, no further motion, no further power, on any of the cars. This interfered with the public travel and business; it interfered with the general public; it was a stoppage of the entire business of the road, and the transportation of passengers at that time; it left every man upon every car right at the point where he was when the wire was cut, to go as best he may to his destination. The effect of the cutting at that time, as disclosed by the testimony, was to injure the machinery,—create what is known, in electrical terms, as a 'short circuit.' It also appears from the testimony in the case that in cutting the wire, unless some person stood there to protect people on the street, there might possibly be danger even from the wire that had been cut."

The charge of the court is:

"That if the plaintiff neglected or refused to place its wires at a certain height over the defendant's track, so as to enable it to carry on its business in a proper way, the way that it had a right to carry it on, the defendant would have a right to raise the wires to the proper height, or remove the wires from its right of way; but in doing this the defendant was required to choose such a time and under such circumstances as would do no damage to the property of the plaintiff, nor damage to the general traffic of what is really a public institution; and the defendant was bound to inquire and ascertain whether attempting to remove the wires at that time and under such circumstances would have any such tendency. The railroad company were bound to inform themselves of that fact before they attempted to abate what they considered a nuisance to the operation of their road. I therefore charge you, as a matter of law, that the cutting of the wires at the time they were cut, and under the circumstances, the attempt to remove them at that time, was unauthorized, and was a trespass, and that the defendants are liable for all the damage that resulted therefrom. The testimony shows that this road ran its last car at 11:30 at night; that the first car started at 5:30 in the morning; that there was a period of time within the 24 hours within which this wire might have been raised, even if it required cutting to raise it, that the defendant might have used in removing it from its track, when the business of the general public would not be

interrupted. Further in this line, in the view of the court, the passage of these street cars over the street is subject to all the other uses of the street. When the street car track is not in use, people have a right to drive over it, walk over it, and use it. The stoppage of these cars at that time of day created an obstruction in every street where the car stopped. It was there an obstruction to the general public travel. We cannot hold that any one has a right to take the law into his own hands under such circumstances as it appears existed at four o'clock on the day of the 16th of May."

Fault is found with the language of this instruction that the defendant was required to choose such a time and under such circumstances as would do *no damage* to the property of the plaintiff, nor damage to the general traffic of what is really a public institution; that all that could be required of the defendant was that it should do no unnecessary damage, as the cutting of the wires alone would be some damage. Included in plaintiff's bill was $41.20 for material and labor "in splicing wire," which was allowed by the jury. All the other items were for losses incurred by the unnecessary damage.

We are satisfied that the evidence shows that there was ample time, while the motive power of the plaintiff was at rest, and when its cars were not running, to have removed these wires. The removal of them was done at a time when it involved great loss to plaintiff and great danger to human life. Under the circumstances, the defendant company was a trespasser *ab initio*, and liable for all damages. It was shown that no bridge on the defendant company's line was higher than 22 feet, and that the Railroad Commissioner had sanctioned and consented to the wires of other street railway companies, at West Bay City and Lansing, being maintained at a height of 22 feet 6 inches. The defendant company refused to permit the plaintiff to string its wires at this height.

The Commissioner of Railroads had no arbitrary power

to fix 24 feet as the height at which such wires must be maintained, in the absence of any showing that a less height was insufficient to prevent any danger to the employés of the railroads. The refusal of the defendant company to permit plaintiff's wires to be raised to 22 feet 6 inches,—and the testimony shows they could have been so raised without cutting the wires or destroying property,—and its choosing of the time to cut such wires when the plaintiff company was in full operation of its 16 miles of road in the city of Saginaw, was such a violation of the plaintiff's rights as cannot be excused, and justifies the recovery of all damages suffered by the plaintiff on account thereof.

It is also claimed that the public, or the rights of the public, are of no concern in this suit. This may be true, but what the court said as to the rights of the public has also no concern here, as it could have had no possible effect upon the jury. The court, in substance, correctly told them that, under the admitted facts in the case, the defendant was liable for all the damages to the plaintiff caused by the cutting of these wires; and what he said about the public and the rights of travelers was but surplusage, which could have done no harm to defendant. The jury gave no damages on account of the public, but simply allowed to plaintiff its items of damages as claimed.

The claim is made that the court was in error in his instructions to the jury as to the recovery of damages for the cost of a new armature to use in dynamo No. 2. The testimony tended to show that this armature was injured by the cutting of the wires, and that it was attempted to cure such injury by repairs, which amounted to $78.80, but that it did not work well after such repairs, and finally a new armature was purchased, at a cost of $375. The defendant upon the trial objected to

any recovery on account of damages to this armature, claiming that there was no testimony tending to show that it was injured by its acts of cutting the wires. The circuit judge charged that if the evidence showed that the repairs did not place No. 2 dynamo in as good condition as it was at the time of the cutting, and it became necessary to supply it with an altogether new armature, plaintiff would be entitled to damage for the cost of such armature, but would not be entitled to charge for the repairs; and that if the armature by the repairs was made as good as it was before the injury, then plaintiff could only recover for such repairs. It is now contended that there was evidence tending to show that this new armature was more expensive than the old one, and of more value, and that plaintiff was only entitled as damages to the value of the old armature as it was before injury, less what it is now worth. The jury did not allow the repairs, but gave the plaintiff damages for the full cost of the new armature. The evidence shows that an armature lasts 10 or 15 years, if not injured by some accident. There was no testimony tending to show that this armature taken out of dynamo No. 2 was worth anything for other purposes or for any use connected with the dynamo, nor any attempt on the part of the defendant on the trial to show that it had any value outside of its use in the dynamo, and there was testimony tending to show it could not be used there. One witness testified that the new armature was a little more expensive than the old one, but the president of plaintiff company testified that it was not. The defendant upon the trial was content with the denial that armature No. 2 was injured at all by the cutting of the wires, and made no attempt to ascertain the value of the old armature, or how much more costly, if any, the new armature was than the old one. Under these

circumstances, we do not think a new trial should be granted because of this claimed excess in damages. The record fails to show that the plaintiff recovered any greater sum than it was entitled to on account of this injury to the armature in dynamo No. 2.

The judgment will be affirmed, with costs.

The other Justices concurred.